SNAVELY *v.* SNAVELY.

5-1629                                        320 S. W. 2d 934

Opinion delivered February 23, 1959.

*Claude F. Cooper* and *T. J. Crowder,* for appellant.

*William S. Rader,* for appellee.

CARLETON HARRIS, Chief Justice. Irene R. Snavely, appellee herein, instituted suit against Max L. Snavely, appellant herein, for separate maintenance. Appellant filed a cross complaint seeking an absolute divorce. On final hearing, the court entered its decree finding that Mrs. Snavely was entitled to separate maintenance, fixed the amount of such maintenance at $200 per month, further ordered the payment of certain bills incurred

by appellee prior to the separation, and granted an additional attorney's fee in the sum of $100.[1] Appellant's cross complaint was dismissed. From the decree of the court, comes this appeal.

The parties were married in Salt Lake City, Utah, on March 2, 1957, having known each other for approximately two years. Appellee had been employed as Chief Stewardess for Western Airlines in Salt Lake City, and appellant was employed as Field Service Representative for Curtis-Wright Aeronautics Corporation. Mr. Snavely was regularly assigned to the Blytheville Air Force Base, but at the time of the marriage, was on special duty in Wendover, Utah.[2] Mrs. Snavely testified that within four days after the marriage, and after receiving a telephone call from Blytheville, Mr. Snavely became cool and indifferent, and the uncontroverted proof shows that the parties had no sexual relationship after ten days or two weeks. Appellee testified that the day after the marriage, her husband took out of his brief case a picture of himself and Miss Anne Lowery, a resident of Blytheville, which had been taken a few weeks before the marriage. However, she testified that he gave assurances that Miss Lowery meant nothing to him, and appellee was satisfied at the time. About the 26th of the month, appellee found in appellant's brief case, two letters from Miss Lowery, dated March 12th and March 23rd. According to her testimony, Miss Lowery expressed her love for appellant, and stated "If you will come back single, we will take on where we left off." Mr. Snavely admitted receiving the letters, and according to his wife, when sometime subsequently asked if he was in love with Miss Lowery, stated, "I don't know. I would like to see her again, but I don't know." Mrs. Snavely further testified that on the same date, he received a call from Blytheville, and told her that he talked

---

[1] Attorney for appellee had previously been awarded a $200 fee, thus making the total fee $300.

[2] According to appellee's testimony, they went together "From April of '55 until my husband came to Blytheville in November of that year, and then he came back to Salt Lake City just before New Years of '56, and stayed there until March, and from then on, the courtship was carried on by air mail and telephone."

with Anne. Appellant denied talking to Miss Lowery over long distance, but stated that the conversations were with two friends in Blytheville, Troy Graham and Joe Laney. Relative to the letters, he stated that he had nothing to do with writing them, did not know they were going to be written, and did not answer them. On March 30th, appellant returned to his regular assignment at the Blytheville Air Force Base. Appellee went to Idaho Falls to leave her car with her mother, following which she came to Blytheville, arriving on April 5th. There, a motel room was obtained, which the parties shared, but no marital relations were engaged in, nor for that matter, as previously stated, after the first ten days or two weeks of the marriage. Mr. and Mrs. Snavely subsequently registered in at the Noble Hotel, but Mr. Snavely refused to stay with his wife, and obtained a room with his friends, the Grahams.

According to appellant, the difficulty between the parties was largely occasioned by their dissimilar religious beliefs. He stated that the reason for terminating sexual relationships was because appellee would not permit the use of contraceptives.[3] Mr. Snavely testified that she stated their children were to be reared in the Catholic church, and that he ''* * * would have absolutely nothing to do with the raising of them and their spiritual welfare.[4] * * *'' He further stated that for these reasons, he told her ''* * * that we would just not have marital relations until this was settled.'' However, appellant admitted that prior to the marriage, the matter of her religion and belief had been thoroughly discussed, and he had talked with the Catholic priest. He further admitted that he had signed an agreement and an oath prior to the nuptials to the ef-

---

[3] Mrs. Snavely testified that appellant never offered to use a contraceptive during their married life. ''* * * In fact, the only one I ever saw was in the glove compartment of his car.''

[4] Mrs. Snavely denied making this statement, but did say, "When we were courting, we discussed the probability of children, and at that time I told my husband that regardless of whomever I married, Catholic or otherwise, the children would have to be reared as Catholics, but as to raising children, that is the duty of the parents, not one or the other, but so far as religion was concerned, they would have to be Catholics, and he understood that."

fect that he would support her beliefs as a Catholic. From his testimony:

"Q. You were fully aware of what you were doing?

A. Yes, sir, under the theory, what I signed, I was familiar with, but that did not include the practical side of it after we married.

Q. What do you mean, it did not include the practical side of it?

A. You think everything is fine until you get into it and begin to realize it."

Accordingly, it is obvious that appellant was already cognizant of the views of his wife, and had full knowledge of what to expect, before the marriage. There was no effort on the part of appellee to conceal her feelings, and certainly her position came as no surprise to him. Mr. Snavely stated he felt that her religion was a barrier because it "* * * will always be above her love for me," and further testified that he had lost his love for appellee. He denied any improper relations with Miss Lowery, and stated that he had not been with her alone since his marriage. The evidence clearly reflects, and appellant admits, that he and Miss Lowery were together on several occasions in the company of other persons. On one occasion, a trip was taken to Memphis in appellant's automobile, by Mr. Snavely and the young woman, together with a married couple. When asked if he had given a gift to Miss Lowery on her birthday, he replied:

"A. Nothing. When is her birthday? Nothing.

Q. To refresh your memory, was not her birthday in the month of June, and didn't you give her an electric razor?

A. Yes, sir, sorry."

Miss Lowery denied any misconduct with appellant, denied being with him alone since his marriage, and denied that she had received any gift.

After reviewing the evidence, we feel that the Chancellor was entirely justified in entering the order for separate maintenance. Mrs. Snavely testified that her husband stated he did not want to live with her, and wanted a divorce,[5] that he was not in love with her,— and the evidence reflects that he moved in with friends rather than live with her. Nor are we overly impressed with Mr. Snavely's statement that their troubles were caused by religious differences. There is nothing in the record that would indicate Mr. Snavely to be a deeply religious man. In fact, the record does not reflect his religious affiliation, nor any suggestion that he has attended church at any place. If religion were really the barrier, one would expect to find testimony relating his own deep-seated beliefs, and faithful attendance at the church of his choice. In our view, the evidence rather reflects that appellant entered into the nuptials without being sure of his own feelings (as between appellee and Miss Lowery); evidently decided within a few days that he had made a mistake, and wanted to be free of the marriage.

We likewise agree with the Chancellor that appellant did not present evidence that would justify a divorce. He principally complains that his wife went through his brief case, and stated that on one occasion she read papers of a secret nature connected with his work. Human nature, being what it is, and appellee having earlier found the letters from Miss Lowery,[6] it would be most remarkable if she had not again gone through the brief case. We daresay, that most any bride or groom, having found amorous communications directed to the other from one who had previously dated the spouse, and already distressed by the indifference of the marriage partner, would not be able to resist the temptation to "look further." The evidence does reflect one act on the part of Mrs. Snavely that she could have better left undone. After the hearing for temporary main-

---

[5] From her testimony: "* * * and then my husband said, 'I have only made two mistakes in my life, one was buying the Oldsmobile, and the other was marrying you.'" A further statement by appellant: "I'm miserable. I want out."

[6] Miss Lowery stated she only wrote one letter.

tenance, appellee wrote Mr. Snavely's company a letter advising that he was married, and stating that his conduct since arriving in Blytheville from Wendover "* * * has been grossly unbecoming to a firm of the status of Curtis-Wright." While this letter served no good purpose, and should not have been written, we certainly do not consider that it would constitute grounds for divorce. Here again, enters the human factor — a woman, angry and hurt, because her husband refused to live with her. It is also noted that this letter was only written after court litigation was underway.

Appellant complains of the amount of the award for Mrs. Snavely's maintenance. The record reflects that he has a net salary of $478 per month (deductions being made for income tax, retirement, health benefits, and life insurance), plus an allowance of $120 per month from the company for "social obligations."[7] In other words, the wife was given one-third of his total net income. Under the evidence in this case, we consider the award entirely proper. At the time of her marriage, Mrs. Snavely gave up a job which paid in excess of $400 per month, and she is presently unemployed. According to her testimony, she is now too old to regain a job as stewardess, and has been unable to find employment in Blytheville. It would also appear that appellant's expenses can be somewhat reduced; for instance, the record reflects that he pays $100 per month room rent,[8] and it appears that a room could be obtained at a much smaller figure.

Appellant also complains that the attorney's fee was excessive, and that appellee had funds of her own with which to employ an attorney. We do not agree. Mrs. Snavely testified that she had $600 when she married, of which some portion had already been spent before the litigation. Admittedly, she was unemployed from the time of the marriage. Since we have concluded that

---

[7] He also receives an advance from the company of $200 per month, but the record is not entirely clear as to whether this amount has to be repaid. For purposes of this discussion, we consider his net income to be $598 per month.

[8] He stated that this amount was meant to also include board, but he takes most of his meals away.

100

appellee was justified in instituting the suit for separate maintenance, and since she was certainly entitled to the services of an attorney to defend against the cross complaint for divorce, we hold appellant's contention to be without merit.

Appellee has moved that she be allowed an additional attorney's fee for services rendered on this appeal. We are of the opinion that such motion should be granted, and appellant shall pay an additional $100 as such fee.

Affirmed, together with the additional attorney's fee.